IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 17, 2024

**STATE OF TENNESSEE v. ERIC LEE HOOSIER, SR.**

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2020-CR-393  Robert Bateman, Judge**

_____

**No. M2022-01305-CCA-R3-CD**

_____

The defendant, Eric L. Hoosier, Sr., was found guilty by a Montgomery County jury of criminal attempt to commit first-degree murder, criminal attempt to commit second-degree murder, employment of a firearm during a dangerous felony, reckless endangerment, and reckless endangerment firing a deadly weapon.  The trial court imposed an effective sentence of seventy years in confinement.  On appeal, the defendant contends the trial court erred in excluding character evidence of a victim, in denying the defendant's motions for judgment of acquittal and new trial, and in sentencing the defendant to the maximum sentence within the range.  The defendant also contends the evidence presented at trial was insufficient to support his convictions.  Following our review, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT H. MONTGOMERY, JR., JJ., joined.

Stephanie Ritchie Mize, Clarksville, Tennessee, for the appellant, Eric Lee Hoosier, Sr.

Jonathan Skrmetti, Attorney General and Reporter; Edwin Alan Groves, Jr., Assistant Attorney General; Robert Nash, District Attorney General; and John A. Stephens, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

At trial, the State presented multiple eyewitnesses to the shooting on January 11, 2020, at the Vintage Lounge, also known as the "V Spot." Collectively, those witnesses testified to the following facts:

On January 11, 2020, Casey Montgomery, Jabbaul Pettus, and Demarcus Miller were celebrating a playoff win by their favorite team. Initially, the three friends intended to make their way to Nashville for the night after a brief stop at the V Spot. When they arrived, the three men made their way through security. Security at the V Spot typically involved one or two security guards at the door checking for identification and unauthorized items, such as weapons. To check for weapons, the security guards used either a pat down technique and/or a metal detection wand. After making their way inside, Mr. Pettus and Mr. Miller went to the restroom while Mr. Montgomery proceeded to the bar. After a few moments, Mr. Montgomery joined the others in the restroom to tell the others that Eric Hoosier, the defendant, was present in the nightclub.

The defendant's presence at the V Spot was noteworthy because the defendant had previously been involved in a physical altercation with Mr. Montgomery's girlfriend, Marilana Jones. Several weeks prior to the night, Ms. Jones had ejected the defendant from an establishment where she was working as security. She testified at trial that after twice asking the defendant to stop blocking an exit, she "jacked the door and [the defendant] flew out." Enraged, the defendant reentered the building and dumped a cup of ice on Ms. Jones' head, initiating a physical altercation between the two. Afterwards, Ms. Jones relayed the incident to Mr. Montgomery and advised him that she had handled the situation.

After Mr. Montgomery, Mr. Pettus, and Mr. Miller exited the restroom, they walked to the bar which was located along the wall of the club, between the entrance and the restroom. After a few minutes, the defendant approached Mr. Montgomery, asking to speak with him. Mr. Montgomery responded that he did not wish to speak with the defendant and wanted to leave "the situation" alone. The defendant then withdrew from Mr. Montgomery and his friends.

The three friends began to share a drink with the V Spot's owner, Wayne Keesee. The men had originally brought a bottle of vodka with them into the club; however, Mr. Pettus decided to retrieve a bottle of Crown Royal from their vehicle. As Mr. Pettus exited the building, he noticed that the defendant followed him into the parking lot. Mr. Pettus returned with the Crown Royal, re-entered through the security checkpoint, and rejoined his friends at the bar. When the defendant re-entered, multiple witnesses described that he evaded the security procedures by putting his hands in the air and spinning around quickly. They testified that the defendant was neither patted down nor waved with the metal detector. Once inside the bar, the defendant was seen staring at Mr. Montgomery and his friends.

Later in the evening, Mr. Montgomery left the club to call his girlfriend, Ms. Jones. During the call, she advised him that he should leave the club because of the defendant's. presence. Mr. Montgomery, in agreement, returned inside the club to find his friends. Once inside, the defendant advanced towards Mr. Montgomery becoming "argumentative" and "aggressive." Mr. Montgomery, again, stated, "I don't want no problems. I just want to get my people and leave." Karen Wicks, the hostess and girlfriend of Mr. Keesee, observed defendant's growing hostility and summoned Mr. Keesee to separate the defendant from Mr. Montgomery. Ms. Wicks testified that she did not hear Mr. Montgomery threaten the defendant.

Mr. Pettus, noticing the escalating situation, gathered his belongings and made his way towards the exit where Mr. Montgomery was standing. As he passed the defendant, Mr. Pettus said, "that's a female, man. You shouldn't have been arguing with her," referencing the prior incident between the defendant and Ms. Jones. Victor Atkinson, an acquaintance of the defendant, also approached the men, reaching out his hand towards the defendant to de-escalate the situation. The defendant responded, "get your m*****f****** hands off me," and pulled away from Mr. Keesee.

Once free from Mr. Keesee, the defendant removed a .40-caliber pistol from his pants and fired one shot into Mr. Montgomery's hip. Mr. Montgomery turned to flee but was shot a second time in his right leg by the defendant. Despite the gunshot wounds, Mr. Montgomery was able to leave the scene and transport himself to the hospital.

After shooting Mr. Montgomery, the defendant turned and fired two shots into Mr. Pettus. Mr. Pettus fell to the ground, unable to move his legs. Multiple witnesses described Mr. Pettus as lying "helpless" and "defenseless" on the floor. The defendant moved to stand over Mr. Pettus' body and struck him in the head with the pistol, causing it to discharge towards the bar. The defendant began to wave the gun towards the other patrons and screamed, "I'll kill every m*****f***** in here." Finally, the defendant leaned over Mr. Pettus and said, "you're gonna respect me," before shooting him three more times. Mr. Pettus testified that he heard the defendant's gun click, indicating he was out of bullets. Multiple witnesses described that the defendant walked calmly out the front door.

While witness testimony concerning the number of patrons inside the V Spot that night varied, several witnesses testified to the chaos during the shooting: people running, screaming, and ducking for cover. Gerald Cannon, one of the patrons at the V Spot, testified that upon hearing the first gunshot, he dove to the ground. As he tried to move to a more secure location near the bar, he felt a pain in his leg. Initially, he thought a table had fallen on him but discovered he had been shot. Mr. Cannon described looking up and seeing the defendant holding a gun.

The State also presented the testimony of Thomas Cetta, the security guard present that night at the V Spot. Mr. Cetta, a former military officer, testified that while it was typical for two security guards to be posted at the V Spot, on the night in question, he was working alone. After hearing the gunshots, he moved into a defensive position near the double doors of the foyer. When he moved inside the doors to obtain a better view, he saw the defendant shoot Mr. Pettus. Mr. Cetta testified, "the defendant looked [him] the face and picked up his gun towards [him]." Mr. Cetta then drew his own weapon, a 9mm, and fired one shot at the defendant.[1] In the subsequent chaos, the defendant was able to evade Mr. Cetta and leave the club.

Officer Alan Greenman, a patrol officer with the Clarksville Police Department ("CPD"), was the first officer on the scene. Officer Greenman testified that when he came through the side door of the building, the club was darkly lit with strobe lights and loud music playing. Officer Greenman observed Mr. Pettus lying on the floor with a gunshot wound to his left chest and Mr. Cannon with a gunshot wound to the leg. Officer Benjamin Goble, a patrol officer with CPD's crime scene team, was tasked with sketching the crime scene. He testified that a 9mm handgun was found inside the security guard's car and a 9mm shell casing was found in the foyer area. He also testified to the locations of several .40-caliber shell casings and projectiles that were recovered from inside the bar as well.

Derek Proctor, an agent with the Tennessee Bureau of Investigation's Tool Mark Analysis Unit, testified as an expert in firearms and tool marks identification. Agent Proctor stated that after testing the projectiles recovered from Mr. Pettus and Mr. Montgomery, he concluded they had been fired by the same .40-caliber weapon; however, the testing was inconclusive to determine the weapon that fired the projectile recovered from Mr. Cannon. Agent Proctor also testified that the .40-caliber weapon used in the shooting was a semi-automatic, which meant that the defendant would need to pull the trigger each time he fired the weapon.

The State also presented evidence of the three victims' injuries from the shooting. Dr. Sarah Limbardo, supervising physician of general surgery at Vanderbilt Medical Center, testified via stipulation that Mr. Pettus suffered from five gunshot wounds and, as a result, was diagnosed as a paraplegic. Mr. Pettus also suffered from other injuries such as a lacerated lung, fractured rib, lacerated spleen, lacerated tail of pancreas, internal bleeding, fractured spine, and acute blood loss. Mr. Montgomery testified that he suffered

---

[1] Initially, Mr. Cetta told the responding law enforcement officers that he was not armed that evening. He explained at trial that he had never been involved in a shooting and did not know the consequences for his actions. Ultimately, he told the officers about firing his weapon and allowed them to search his vehicle for his gun.

- 4 -

a gunshot wound to his hip and to his right leg. The bullet that struck his hip traveled through his stomach, causing internal bleeding. As a result of the shooting, Mr. Montgomery continued to suffer from a limp, as well as emotional trauma. Mr. Cannon testified that the bullet that struck him in his leg broke his tibia, necessitating that a rod be placed in his leg from his knee to his ankle.

The defendant presented testimony on his own behalf, offering a contrary version of events. He testified that during his prior altercation with Ms. Jones, he had not physically assaulted her. Instead, he described Ms. Jones as the aggressor who pushed and kicked him. Further, as to the night of January 11, 2020, the defendant described himself as the victim of multiple threats from Mr. Montgomery and Mr. Pettus. He testified that when he first approached Mr. Montgomery that evening, Mr. Montgomery threatened him, saying, "B**** A** N****, I'm going to kill you." The defendant also testified that in the moments before the shooting, it was Mr. Pettus who aggressively advanced towards him and threatened to kill him. The defendant claimed that it was Mr. Pettus' threats that caused the evening to become chaotic.

Further, the defendant testified that he did not bring a gun into the V Spot that night and that he proceeded through the security checkpoint each time he entered the club. He testified that he did not know how the .40-caliber pistol appeared before him, stating, "I can't say I seen the person who handed it to me." The defendant further testified that when Mr. Montgomery and Mr. Pettus, who were standing in front of him, moved, he "freaked out." The defendant then admitted that "I shot Montgomery. JP came towards me, and I shot JP." The defendant claimed that he was acting in self-defense, because he believed Mr. Montgomery and Mr. Pettus were going to do something to him and that "[he] feared Pettus more than anything."

During the defendant's testimony, a hearing was held outside of the jury's presence whereby the defendant testified that while Mr. Pettus lay unarmed on the floor after being shot by the defendant, Mr. Pettus said, "B**** A** N****. I'm going to kill you. I put that on GD."[2] The defendant stated this threat frightened him because he had witnessed Mr. Pettus be involved in a gang-related shooting at an unknown time prior to that evening. The defendant sought to offer this testimony at trial in support of his claim that he shot Mr. Pettus in self-defense. The State argued that any mention of the victim's gang affiliation was an attempt to "shame" the victim and attack his credibility. The trial court determined that the "character of the alleged victim for violence which was known to the defendant" would be admissible; however, references to the Gangster Disciples, or other gangs, would not be allowed.

---

[2] "GD" was a reference to the Gangster Disciples, a known gang in Montgomery County.

Following deliberations, the jury found the defendant guilty of criminal attempt to commit first-degree murder, criminal attempt to commit second-degree murder, employment of a firearm during a dangerous felony, reckless endangerment, and reckless endangerment firing a deadly weapon.

At the subsequent sentencing hearing, the defendant entered a statement of remorse into the record.

The State presented the testimony of Ms. Torssha Brown, the fiancée of Jabbaul Pettus, about Mr. Pettus' quality of life following the shooting. Prior to his death from an unrelated cause, Mr. Pettus had suffered both physically and emotionally. As a result of becoming paraplegic, he was no longer able to leave the house to enjoy time with friends or coach his son's basketball team. Ms. Brown also testified to Mr. Pettus' embarrassment over having to use a catheter.

Ultimately, the trial court stated it considered the principles under Tennessee Code Annotated sections 40-35-102 and -103, the evidence presented at trial and the sentencing hearing, the presentence report, the arguments of counsel, the nature of the characteristics of the criminal conduct involved, the mitigating and enhancement factors presented by both parties, statistical information from the Administrative Office of the Courts, and the statement of remorse by the defendant. The trial court then imposed an effective 70-year sentence. The defendant filed a timely Motion for New Trial, which the trial court denied. Prior to the trial court's denial, the defendant filed this Notice of Appeal.

### *Analysis*

On appeal, the defendant challenges the trial court's exclusion of evidence related to the victim's character, the denial of the defendant's motions for judgment of acquittal and new trial, the sufficiency of the evidence, and the trial court's sentencing determination.[3]

### I.      Evidence of the Victim's Alleged Gang Affiliation

The defendant challenges the trial court's evidentiary ruling excluding evidence of Jabbaul Pettus' alleged affiliation in the Gangster Disciples. The State asserts the trial court properly excluded the evidence as it was "not material" and was "outweighed by the danger of unfair prejudice." We agree with the State.

---

[3] For the sake of clarity, we have reordered and renumbered the issues from the order they appeared in the defendant's brief.

"Trial courts have broad discretion in determining the admissibility of evidence and their rulings will not be reversed absent an abuse of that discretion." *State v. McLeod*, 937 S.W.2d 867, 871 (Tenn. 1996). Tennessee Rule of Evidence 401 provides that "'[r]elevant evidence' means evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401. Relevant evidence is typically admissible, while irrelevant evidence is inadmissible. Tenn R. Evid 402.

"Generally, the admissibility of evidence rests within the trial court's sound discretion, and the appellate court does not interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2017)). This Court finds an abuse of that discretion when the trial court applies "an incorrect legal standard or reaches a conclusion that is 'illogical or unreasonable and causes an injustice to the party complaining.'" *Lewis*, 235 S.W.3d at 141 (quoting *State v. Ruiz*, 204 S.W.3d 772, 778 (Tenn. 2006)).

This Court has stated that "evidence concerning gang affiliation is character evidence subject to Rule 404(b)." *State v. Clayton*, No. W2000-00213-CCA-R3-CD, 2001 WL 720612, at *3 (Tenn. Crim. App., 2001) Therefore, provided that the trial court substantially complies with the procedure of Rule 404(b), the trial court's decision to admit or exclude evidence will not be overturned absent an abuse of discretion. *State v. Jones*, 450 S.W.3d 866, 891 (Tenn. 2014). Rule 404(b) requires:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b)(1-4). Trial courts are encouraged to take a "restrictive approach [to] [Rule] 404(b) . . . because 'other act' evidence carries a significant potential for unfairly influencing a jury." *State v Dotson*, 254 S.W.3d 378, 387 (Tenn. 2008).

- 7 -

Here, outside the presence of the jury, the defendant presented his proposed character evidence of the victim that included both a specific bad act to which the defendant was a witness and an alleged affiliation with a gang. After hearing the testimony and arguments of counsel, the trial court weighed the defendant's right to a defense against the potential prejudice and relevancy of the evidence and, ultimately, found that the testimony of the Mr. Pettus' involvement in a shooting was relevant but excluded any mention of his alleged gang affiliation. Accordingly, the trial court substantially conformed with the requirements of Rule 404(b), and therefore, we cannot conclude that the trial court's exclusion of the victim's alleged gang affiliation was illogical or unreasonable.[4] Therefore, the defendant is not entitled to relief on this issue.

## II.     Sufficiency of the Evidence

On appeal, the defendant challenges the sufficiency of the convicting evidence in multiple ways—denial of the defendant's motion for judgment of acquittal; denial of the defendant's motion for new trial; and a general challenge to the sufficiency of the evidence. However, as noted by the State, the defendant has waived his challenges to the trial court's denial of his motion for judgment of acquittal and motion for new trial. Additionally, upon our review of the briefs and the record, we affirm the defendant's convictions.

### A. Motion for Judgment of Acquittal

The defendant contends the trial court erred when it failed to grant his motion for judgment of acquittal. However, the defendant chose to present evidence at trial after the trial court's denial of his motion for judgment of acquittal, specifically, the testimony of the defendant. When a defendant offered "evidence in support of his defense rather than rest his case, [the defendant] waived [the] issue for purposes of appellate review." *State v. Blanton*, 926 S.W.2d 953, 957 (Tenn. Crim. App. 1996). "This Court may not return to the midpoint of the trial and then order the trial court to direct a judgment of acquittal based upon the basis of the record as it then existed." *State v. Ball*, 973 S.W.2d 288, 292 (Tenn. Crim. App. 1998); *See also State v. Thompson,* 549 S.W.2d 943, 946 (Tenn. 1977). Accordingly, the defendant waived the issue of that denial on appeal.

### B. Motion for New Trial

The defendant also challenges the trial court's denial of his motion for new trial. However, this issue is also deemed waived by the insufficiency of the defendant's brief.

---

[4] Additionally, it is difficult to find an injustice towards the defendant when it was the defendant's counsel who stated during argument that reference to the Gangster's Disciples was unnecessary if the defendant was allowed to testify to the shooting involving Mr. Pettus.

Specifically, the brief does not comply with the Tennessee Rules of Appellate Procedure. Rule 27(a)(7) requires that appellant briefs must contain an argument with both citations to the authorities and refences to the record, as well as a statement of the applicable standard of review. Tenn. R. App. P. 27(a)(7). "The Tennessee Rules of Appellate Procedure require more than bare assertions without citations to authority." *State v. Cross*, 362 S.W.3d 512, 526 (Tenn. 2012). "It is not the role of the courts, trial or appellate, to research or construct the litigant's case or arguments for him or her, and where a party fails to develop an argument in support of his or contention or merely constructs a skeletal argument, the issue is waived." *Id.* (citing *Sneed v. Board of Prof'l Responsibility*, 301 S.W.3d 603, 615 (Tenn. 2010).

Here, while the defendant cites to the standard of review for challenges to the sufficiency of the evidence and Tennessee Rules of Criminal Procedure Rule 33(d) relating to motions for new trial, his entire argument consists of one overly general sentence: "When considering the testimony and evidence presented in this matter, the court should have found that it did not support the determination made by the [j]ury impaneled in this [m]atter." The defendant fails to explain or to cite which testimony or evidence do not support the jury's verdict or attempt to explain how the evidence is not sufficient. Consequently, as presented, the defendant's brief fails to comply with the requirements of Tennessee Rules of Appellate Procedure, Rule 27 and provides this Court with no guidance. Therefore, the defendant has waived review of this issue.

## C. Sufficiency of the Evidence

Initially we note that the defendant's brief challenging the sufficiency of the convicting evidence at best meets the minimum requirements of Tennessee Rules of Appellate Procedure 27. However, despite the minimal argument and the lack of citations to the record, we will, in the interest of justice, address the defendant's challenge to the sufficiency of the evidence.

When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ( "Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190–92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pappas*, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge,

accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Our Supreme Court has stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus, the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

Guilt may be found beyond a reasonable doubt where there is direct evidence, circumstantial evidence, or a combination of the two. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990) (citing *State v. Brown*, 551 S.W.2d 329, 331 (Tenn. 1977); *Farmer v. State*, 343 S.W.2d 895, 897 (Tenn. 1961)). The standard of review for sufficiency of the evidence "is the same whether the conviction is based upon direct or circumstantial evidence." *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009). Moreover, the jury determines the weight to be given to circumstantial evidence and the inferences to be drawn from this evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence are questions primarily for the jury. *See id.* at 379. Circumstantial evidence alone may be sufficient to support a conviction. *State v. Richmond*, 7 S.W.3d 90, 91 (Tenn. Crim. App. 1999). This Court, when considering the sufficiency of the evidence, shall not reweigh the evidence or substitute its inferences for those drawn by the trier of fact. *Id.* This Court will not exchange its' "inferences for those drawn by the trier of fact from circumstantial evidence." *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

### a. Criminal Attempt to Commit First-Degree Murder

The jury convicted the defendant of criminal attempt to commit first-degree murder for the shooting of Jabbaul Pettus. "A person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the

circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." Tenn. Code Ann. § 39-12-101(a)(3). First-degree murder is "a premediated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1). In this context, premeditation is "an act done after the exercise of reflection and judgment." Tenn Code Ann. § 39-13-202(d). Tennessee Code Annotated section 39-13-202(d) further states:

> "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accuse was sufficiently free from excitement and passion as to be capable of premeditation.

*Id.* "The element of premeditation is a question for the jury which may be established by proof of the circumstances surrounding the killing." *State v. Young*, 196 S.W.3d 85, 108 (Tenn. 2006) (citing *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997)). The Tennessee Supreme Court has identified certain factors which tend to support a finding of premeditation, including: "the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime; and[,] calmness immediately after the killing." *Bland,* 958 S.W.2d at 660. Likewise, lack of provocation by the victim, failure to render aid, and destruction or secretion of evidence may also support an inference of premeditation. *See State v. Larkin*, 443 S.W.3d 751, 815-816 (Tenn. Crim. App. 2013) (internal citations omitted). Finally, the firing of multiple shots can allow a jury to infer premeditation. *See State v. Halake*, 102 S.W.3d 661, 669 (Tenn. Crim. App. 2001)

The jury heard proof that the defendant shot Mr. Pettus, an unarmed man, five times without provocation. After the initial two gunshots, while Mr. Pettus was lying defenseless on the floor, the defendant stood over him and said Mr. Pettus would "respect him." The defendant struck Mr. Pettus with the gun and fired three more rounds into his body. When he ran out of bullets, the defendant walked calmly out of the building and drove away from the scene. Although the defendant claimed he acted in self-defense when firing the last three shots, the jury determines the credibility of witnesses, the weight afforded to the evidence, and resolves any conflicts within the proof presented. *See State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008) (citing *Byrge v. State*, 575 S.W.2d 292, 295 (Tenn. Crim. App. 1978)). After examining the evidence in the light most favorable to the State, we conclude the proof was sufficient for a rational jury to find beyond a reasonable doubt that the defendant was guilty of criminal attempt to commit first-degree murder. The defendant is not entitled to relief.

### b. Criminal Attempt to Commit Second-Degree Murder

The jury convicted the defendant of criminal attempt to commit second-degree murder for the shooting of Casey Montgomery. Second-degree murder is the "knowing killing of another." Tenn. Code Ann. § 39-13-210(a)(1). A person acts knowingly "when the person is aware that the conduct is reasonably certain to cause the result." Tenn. Code Ann. § 39-11-302(b). "[T]he 'nature of the conduct' that causes death is inconsequential." *State v. Page*, 81 S.W.3d 781, 787 (Tenn. Crim. App. 2002). A knowing intent is shown if the defendant acts with an awareness that his conduct is reasonably certain to cause the victim's death. *See id.* at 790-93. Whether a defendant acted "knowingly" is a question of fact for the jury. *State v. Inslow*, 52 S.W.2d 53, 59 (Tenn. Crim. App. 1993).

The evidence, considered in the light most favorable to the State, showed the defendant fired two shots into Mr. Montgomery, an unarmed man. Additionally, the defendant fired the second shot as Mr. Montgomery was attempting to flee. Based on this evidence, a rational jury could find the defendant guilty of criminal attempt to commit second-degree murder beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

### c. Employment of a Firearm during a Dangerous Felony

The defendant was also convicted of the offense "to employ a firearm during the . . . [c]omission of a dangerous felony." Tenn. Code Ann. § 39-17-1324(b)(1). One such "dangerous felony" is attempted first-degree murder. Tenn. Code Ann. § 39-17-1324(b)(2), (i)(1)(B). The term "employ" means to "to make use of." *State v. Fayne*, 451 S.W.3d 362, 370 (Tenn. 2014). The evidence presented at trial showed the defendant used a gun in his attempts to kill both Mr. Montgomery and Mr. Pettus. When this evidence is viewed in the light most favorable to the State, a rational jury could find the defendant employed a firearm during a dangerous felony beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

### d. Reckless Endangerment

The defendant was convicted for the reckless endangerment of Gerald Cannon. A person "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits reckless endangerment. Tenn. Code Ann. § 39–13–103(a). At trial, the State introduced evidence to indicate the defendant fired multiple shots inside the V Spot, an occupied public establishment. This testimony was corroborated by Officer Goble who testified to the location of projectiles and casings from the .40-caliber pistol inside the club. Mr. Cannon testified at trial that he

suffered a gunshot wound to his right leg and saw the defendant holding a gun. Based on this evidence, a rational jury could find the defendant guilty of reckless endangerment beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

### e. Reckless Endangerment Firing a Deadly Weapon

Lastly, the defendant was convicted of reckless endangerment by firing a deadly weapon near other patrons. A person "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits reckless endangerment. Tenn. Code Ann. § 39-13-103(a). If reckless endangerment is accomplished with a deadly weapon, the offense is a Class E felony. Tenn. Code Ann. § 39-13-103(b)(2). At trial, the State introduced evidence to indicate the defendant fired multiple shots from a .40-caliber pistol inside an occupied public establishment. Based on this evidence in the light most favorable to the State, a rational jury could find the defendant guilty of reckless endangerment by firing a deadly weapon beyond a reasonable doubt. The defendant is not entitled to relief on this issue.

### D. Sentencing

In determining an appropriate sentence, a trial court must consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on mitigating and enhancement factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement the defendant makes on his own behalf as to sentencing; and (8) the potential for rehabilitation. Tenn. Code Ann. §§ 40-35-103(5), -113, -114, -210(b). In addition, "[t]he sentence imposed should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(4).

Pursuant to the 2005 amendments, the Sentencing Act abandoned the statutory presumptive minimum sentence and rendered enhancement factors advisory only. *See* Tenn. Code Ann. § 40-35-114, -210(c). The 2005 amendments set forth certain "advisory sentencing guidelines" that are not binding on the trial court; however, the trial court must nonetheless consider them. *See id.* § 40-35-210(c). Although the application of the factors is advisory, a court shall consider "[e]vidence and information offered by the parties on the mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114." *Id.* § 40-35-210(b)(5). The trial court must also place on the record "what enhancement or mitigating factors were considered, if any, as well as the reasons for the sentence, in order to ensure fair and consistent sentencing." *Id.* § 40-35-210(e). The weighing of mitigating and

enhancing factors is left to the sound discretion of the trial court. *State v. Carter,* 254 S.W.3d 335, 345 (Tenn. 2008). The burden of proving applicable mitigating factors rests upon appellant. *State v. Moore,* No. 03C01-9403-CR-00098, 1995 WL 548786, at *6 (Tenn. Crim. App. Sept. 18, 1995) (citation omitted). The trial court's weighing of the various enhancement and mitigating factors is not grounds for reversal under the revised Sentencing Act. *Carter,* 254 S.W.3d at 345 (citing *State v. Banks,* No. W2005-02213-CCA-R3-DD, 2007 WL 1966039, at *48 (Tenn. Crim. App. July 6, 2007), *aff'd as corrected,* 271 S.W.3d 90 (Tenn. 2008)).

During the sentencing hearing, the trial court stated that it reviewed the evidence, the presentence report, the principles of sentencing and the arguments of counsel, the nature and characteristic of the criminal conduct involved, and all the other requirements of Tennessee Code Annotated section 40-35-210. Further, the trial court stated on the record the enhancement factors it had applied: (1) the defendant had a previous history of criminal conduct, (3) the offense involved more than one victim, (9) the defendant employed a firearm during the commission of the offense, and (10) the defendant had no hesitation about committing a crime when the risk to human life was high. *See* Tenn. Code Ann. § 40-35-114. The trial court also took into consideration the defendant's assertion that he was under strong provocation when committing the offense. However, the trial court stated that this mitigating factor did not apply. *See* Tenn. Code Ann. § 40-35-113. While the trial court mentioned the defendant's proffer of remorse, it did not give it weight in its determination.

The defendant argues that the trial court failed to take into consideration the defendant's age and unstable childhood, both mentioned in the presentence report. However, the defendant failed to meet his burden of proving either of these mitigating factors at the sentencing hearing. First, as to the mitigating factor of age, the defendant had the burden of showing that because of his old age, he lacked substantial judgment when committing the offense. *See* Tenn. Code Ann. § 40-35-113(6). The defendant did not present evidence of his lacking substantial judgment due to age and merely asserted, without evidentiary support, that his age was associated with a lower rate of recidivism. Second, as to the defendant's unstable childhood, the defendant failed to provide evidence that this experience was a substantial ground tending to excuse or justify the defendant's criminal conduct. *See* Tenn. Code Ann. § 40-35-113(3). Therefore, the defendant's arguments are without merit.

It is clear from the record that the trial court applied the purposes and principles of sentencing and weighed the mitigating and enhancement factors before imposing the maximum sentence authorized. Because the trial court's sentence was within range and levied in compliance with the purposes and principles of sentencing, there is no error. Therefore, we conclude the defendant is not entitled to relief on this issue.

- 14 -

*Conclusion*

Based on the foregoing authorities and reasoning, we affirm judgments of the trial court.

_____
J. ROSS DYER, JUDGE